900 So.2d 619 (2005)
Martin Luther KING, Appellant,
v.
KING MOTOR COMPANY OF FORT LAUDERDALE, INC., a Florida corporation, Primus Automotive Financial Services, Inc., a foreign corporation, and Kia Motors of America, Inc., a foreign corporation, Appellees.
No. 4D03-906.
District Court of Appeal of Florida, Fourth District.
March 9, 2005.
Diane H. Tutt of Diane H. Tutt, P.A., Davie, Rebecca J. Covey of Rebecca J. Covey, P.A., Fort Lauderdale, and Raymond G. Ingalsbe of Raymond G. Ingalsbe, P.A., Palm Beach Gardens, for appellant.
Nancy W. Gregoire of Bunnell, Woulfe, Kirschbaum, Keller, McIntyre & Gregoire, P.A., Fort Lauderdale, and Ricardo A. Reyes of Tobin & Reyes, P.A., Boca Raton, for appellee King Motor Company of Fort Lauderdale, Inc.
Kimberly A. Ashby of Akerman Senterfitt, Orlando, and W. Scott Powell of Roth, Powell & Pearson, P.A., Winter Park, for appellee Kia Motors of America, Inc.
Kenneth L. Paretti of Adams, Quinton & Paretti, P.A., Miami, for Amicus Curiae *620 Florida Automobile Dealers Association, Inc.
PER CURIAM.
Martin Luther King filed suit against King Motor Company of Fort Lauderdale, Inc. and Kia Motors of America, Inc. for various claims arising from his purchase of a Kia from King Motor. King appeals the summary judgments granted to King Motor and Kia on five grounds. We affirm in all respects, but write to address the issue involving the execution of two Florida Simple Interest Vehicle Retail Installment Contracts (RISC).
On February 27, 1998, King purchased a new 1997 Kia Sephia from King Motor. During negotiations for the vehicle, King agreed to a monthly payment of $270-280 which is reflected on a buyer's order. In his deposition, King indicated that he wished to purchase a vehicle in the $10,000-12,000 price range, but the purchase price totaled in excess of $14,500. King's expert testified that this price was in excess of the fair market value of the vehicle.
King then signed two RISCs, one including an unrequested extended warranty, and one not including the warranty. In his deposition, King testified that he was assured he would get a good deal as far as the interest rate. Both RISCs reflected an interest rate of 16.5%, and King Motor did not sign either RISC pending the assignment of the loan to a third party. King's expert testified that the high interest rate resulted from the overpricing of the vehicle.
Finally, King signed a bailment agreement making the sale contingent on the assignment of the loan to a third party, an industry practice often referred to as "spot delivery" or "conditional sale." King admitted that he had copies of all the documents he executed when he left the dealership and that King Motor ultimately executed the RISC not including the warranty, which it then assigned to Primus Automotive Financial Services, Inc.
In August 1998, King began experiencing mechanical problems with the vehicle. On August 10, the vehicle was towed to King Motor and a loose connection in the fuse box was repaired under warranty. King's vehicle was again towed to King Motor on August 31 and the entire fuse box compartment was replaced under warranty. King testified that the vehicle continued experiencing problems after these repairs.
In December 1998, King's vehicle was once more towed to King Motor after it stalled and could not be restarted. A King Motor service technician concluded that the vehicle's problem on this occasion stemmed from the installation of two O-rings between the oil filter and engine by Pep Boys in September 1998. The technician noted that oil covered the engine and that no oil remained in the engine, and that the engine failure occurred because the timing belt had slipped due to cam shaft damage from the lack of oil. King claims that he was not informed of the double O-ring condition but was told that oil spilled on the engine causing a timing problem. King's expert testified that the double O-ring condition would have surfaced earlier than December, that the vehicle underwent additional electrical repairs after repossession, and that the December problem was likely electrical in nature. However, the expert could not explain how the oil spillage would result from an electrical problem. Because the resulting damage from the double O-ring was not covered by the warranty, King Motor requested King to authorize an engine tear down, at his expense, to diagnose the extent of engine damage. King refused to authorize the testing and left the vehicle at *621 King Motor. A King Motor manager testified that no repair estimate was generated due to King's refusal to authorize testing.
In March 1999, as the vehicle remained at King Motor, King Motor contacted Primus, which repossessed the vehicle despite King having made all monthly payments. King was given ten days to redeem the vehicle, but did not do so. Primus then sold the vehicle to a third party and sought a deficiency judgment against King.
King filed suit against King Motor and Primus, which is not a party to this appeal, and later Kia, in an amended complaint. King filed a second amended complaint and Kia filed a motion to dismiss three counts of that complaint, which was granted and the case was dismissed with prejudice. King appealed, and this Court reversed and remanded the case for further proceedings. See King v. King Motor Co. of Fort Lauderdale, 780 So.2d 937 (Fla. 4th DCA 2001). King then filed a third amended complaint, which is the operative pleading for purposes of this appeal.
Count I of the complaint alleges a Florida Deceptive and Unfair Trade Practices Act (FDUTPA) violation against King Motor. To support this claim, King makes the following allegations which are relevant to this appeal: that King Motor forged his signature on a repair estimate and attempted to obtain his signature on incomplete contracts, charged King $1,285 for an unrequested extended warranty, misrepresented the sale price of the vehicle, failed to credit King with $100 of his down payment, charged an excessive 16.5% interest rate, failed to sign the retail installment sales contracts involved in the transaction, told plaintiff that he was being provided "with the best possible interest rate," told plaintiff that the December defects were not covered by the warranty because they were caused by Pep Boys, and destroyed the oil filter evidence.
Count II of the complaint is a claim for fraud and deceit against King Motor. The count alleges the following misrepresentations and omissions by King Motor which are relevant to this appeal: King Motor induced King to purchase a service agreement not reflected on the buyer's order, failed to accurately reflect the amount of King's down payment, placed King in a finance agreement with an uncompetitively high interest rate and long term, misrepresented the purchase price in the buyer's orders or RISCs, diagnosed the December car problems as being outside the scope of the warranty, refused to provide King with a written repair estimate, and destroyed the oil filter evidence.
Count III asserts a claim for violation of the Florida Motor Vehicle Repair Act (FMVRA) against King Motor. Included in this claim are the following allegations relevant to this appeal: King Motor failed to properly repair King's motor vehicle, attempted to charge King for defective repair attempts, failed to provide a written repair estimate, failed to obtain or forged King's signature on repair estimates, and failed to honor applicable warranties.
Count IV is a claim for violation of the Florida Motor Vehicle Warranty Enforcement Act (Lemon Law) against Kia. King makes the following allegations relevant to this appeal: Kia failed to conform the vehicle to the standards of the warranty and Kia through King Motor failed to make adequate repairs or provide King with a statement of repairs.
Count V is a claim for violation of the Magnuson-Moss Express Warranty Act against Kia. The claim includes the following relevant allegations: Kia provided an express warranty to purchasers of its vehicles, breached the express warranty by selling a defective vehicle to King, failed to *622 repair the defects although given the opportunity, and failed to offer a replacement or refund due to the defective nature of the vehicle.
Count VI of the complaint alleges a violation of the Magnuson-Moss Implied Warranty Act against Kia. The count includes the following relevant allegations: Kia impliedly warranted that the vehicle was merchantable and fit for its ordinary purposes, breached the warranty by selling King a defective vehicle, failed to correct the defects although given the opportunity, and failed to offer a replacement or refund due to the defective nature of the vehicle.
Count VII, as amended by the Second Amended Count VII of Third Amended Complaint, alleges a violation of the Florida Motor Vehicle Retail Sales Finance Act (FMVRSFA) against King Motor. The relevant allegations in this claim include: King Motor obtained King's signature on an incomplete RISC and failed to itself sign the form, failed to mail King a signed copy of the RISC, and obtained King's signature on a bailment agreement.
King Motor and Kia then filed motions for summary judgment that were granted by the trial court.
The standard of review applicable to summary judgment is de novo. See Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So. 2d 126, 130 (Fla.2000); Markham v. PPI, Inc., 843 So.2d 922, 924 (Fla. 4th DCA 2003); Gasch v. Harris, 808 So.2d 1260, 1261 (Fla. 4th DCA 2002). "Summary judgment is proper if there is no genuine issue of material fact and if the moving party is entitled to a judgment as a matter of law." Aberdeen, 760 So.2d at 130. To obtain summary judgment, the proof presented "`must be such as to overcome all reasonable inferences which may be drawn in favor of the opposing party.'" Markham, 843 So.2d at 924 (quoting Holl v. Talcott, 191 So.2d 40, 43 (Fla.1966)).
Concerning the "spot delivery" or "conditional sale," King contends that it is improper for a motor vehicle dealer to have a buyer execute two RISCs and then itself sign one of them upon assignment to a third party financier. Furthermore, King alleges that it is improper for the dealer to have the buyer execute a bailment agreement, because once the RISC is executed it cannot be made contingent on acceptance by a third party. In oral argument, King emphasized provisions of the Federal Truth in Lending Act (TILA) to support these contentions.
King Motor responds that conditional delivery has been approved by the Florida legislature. See § 319.001(8), Fla. Stat. (defining "new motor vehicle" to include those where "legal title is not transferred but possession of a motor vehicle is transferred pursuant to a conditional sales contract or lease and the conditions are not satisfied and the vehicle is returned to the motor vehicle dealer"); § 320.60(1), Fla. Stat. (defining "motor vehicle" in substantially the same manner); § 520.02(14), Fla. Stat. (defining "retail installment contract" to include "a conditional sales contract and a contract for the bailment or leasing of a motor vehicle by which the bailee or lessee contracts to pay as compensation for its use a sum substantially equivalent to or in excess of its value and by which it is agreed that the bailee or lessee is bound to become, or for no further or a merely nominal consideration, has the option of becoming, the owner of the motor vehicle upon full compliance with the provisions of the contract.").
We reach the following conclusions. First, we do not reach King's TILA arguments because no TILA claims were raised in King's complaint. The claims in King's complaint were based solely on *623 state law. There is one citation to TILA in King's FMVRSFA count; however, this citation is not linked to any claim that it was improper for King Motor to have King execute two RISCs and a bailment agreement.
Second, we do not find King's state law arguments on this point to be persuasive. This is because the statutes cited by King Motor, in addition to cases, at the very least contemplate the use of conditional sales contracts in the motor vehicle sales industry. See Dodge City, Inc. v. Byrne, 693 So.2d 1033, 1035 (Fla. 2d DCA 1997)(buyers simultaneously executed several documents including multiple RISCs, and the court concluded "[w]hen the contracts are read together, it is clear that the buyers agreed to return the vehicle to Dodge City if the dealership could not find financing with an outside lender."); Huskamp Motor Co. v. Hebden, 104 So.2d 96 (Fla. 3d DCA 1958)(motor vehicle sales contract indicated it was not valid until approved by a finance company, and the court concluded: "It would be difficult to rationalize a theory whereby the ownership of the Chevrolet [the trade-in vehicle] passed immediately to Huskamp and then, upon failure to obtain financing, reverted back to Murphy. By a very reading of the contract, it is clear that no obligation existed until a satisfactory financing arrangement was obtained."). As a result, we affirm.
AFFIRMED.
GUNTHER, STONE, and TAYLOR, JJ., concur.